[Crim. No. 11860. In Bank. Apr. 14, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DENNIS COUNCLE McGAUTHA and WILLIAM RODNEY WILKINSON, Defendants and Appellants.

Herman F. Selvin and Alfred Bornstein, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas S. Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—The District Attorney of Los Angeles County charged Dennis Councle McGautha, William Rodney Wilkinson, and Fannie Lue Smith by information with two counts of armed robbery (Pen. Code, § 211) and one count of murder in the first degree (Pen. Code, § 187). Defendant McGautha was also charged with four prior felony convictions, all of which he admitted. The trial court granted a severance as to Fannie Lue Smith.

Defendants McGautha and Wilkinson were convicted by a jury of two counts of armed robbery, one committed against Pon Lock and one against Benjamin Smetana. Both defendants were also convicted of first degree murder in the death of

Mr. Smetana. The jury fixed McGautha's penalty on the murder count at death, and Wilkinson's penalty on that count at life imprisonment. The trial court merged the murder count against defendant Wilkinson with the second robbery count for sentencing purposes, and ordered that defendant Wilkinson's sentences on the murder count and the first robbery count be served concurrently. Defendant McGautha's penalty having been fixed at death, his appeal to this court is automatic (Pen. Code, § 1239, subd. (b)). On January 18, 1968, we ordered Wilkinson's appeal, then pending before the Court of Appeal, transferred to this court so that it could be heard together with McGautha's automatic appeal.

We point out why we have concluded that the judgments against both defendants should be affirmed.

1. *The Facts*

(a) *The Pon Lock Robbery:* On February 14, 1967, at about 2:30 p.m., two men entered a market at 3772 Market Street in Los Angeles. One of the men asked the owner, Mrs. Pon Lock, for a pint of wine, which she gave him. He then pointed a gun at her and demanded money. At the same time the other man pointed a gun at a customer, Mrs. Jean Lim. After obtaining almost $300 the robbers left. Mrs. Lock chased them but they escaped.

Both defendants were positively identified by Mrs. Lock and Mrs. Lim as the robbers. Mrs. Lock indicated that it was McGautha who confronted her and took the money, while Mrs. Lim testified that Wilkinson had kept her at bay with a gun. Sell Morgan, who lived near the Wall Street market, testified that Wilkinson was one of two men who parked in front of his house in a 1960 white Pontiac. Morgan indicated that a woman had remained in the car while the two men were gone, and that the men returned to the car and drove away immediately before Mrs. Lock emerged from her market shouting that she had been robbed. Byron Shelton, a second-grade student, testified that he had seen Wilkinson in the store with another man on the afternoon of the robbery. Byron stated that after he left he saw the two men run from the store. Although he was unable to identify the second man, Byron did indicate that this person was carrying a bottle of wine when he left the store with Wilkinson.

(b) *The Smetana Robbery*: Mrs. Lola Smetana testified that at 5:30 in the afternoon of February 14, 1967, she was in her store at 2151 Venice Boulevard in Los Angeles with her

husband Benjamin and a customer. A woman entered the store, followed shortly by two men who asked for a bottle of wine. One of the men, whom Mrs. Smetana identified as Wilkinson, then pulled a gun and told her not to move. Mrs. Smetana identified McGautha as the other man, and stated that he also had a gun and was holding the arms of the customer across the store from where she and her husband were standing. Wilkinson then struck her on the side of her head and she fell to the floor. She heard a shot and her husband collapsed. She saw neither smoke nor a flash, and was unable to say which of the two men had shot her husband. Mrs. Smetana was also unable to remember whether the woman who entered immediately prior to the robbery had left before or after the beginning of the offense. Mrs. Smetana indicated some uncertainty as to which defendant had struck her and which defendant had stood further away with the customer. As a result of the shooting, Mr. Smetana died a few hours after the robbery.

Miss Erma Dupree stated that McGautha, Wilkinson, Fannie Lue Smith, and she were good friends. On February 14 all four of them drove Fannie Lue's 1960 white Pontiac to the store on Venice Boulevard. Fannie Lue went into the store, followed by the defendants; Miss Dupree remained in the car. After an unstated period of time Fannie Lue returned to the car, followed hurriedly by the defendants. Miss Dupree did not hear a shot fired inside the market. Upon returning to Fannie Lue's house McGautha stated that he had robbed the market and shot a man. In order to convince Fannie Lue that he had done so he showed her an empty cartridge in the chamber of his gun. According to Miss Dupree, McGautha later explained that Wilkinson had hit a woman and that he, McGautha, had shot the man in question. A few days later, Miss Dupree testified, McGautha discovered a newspaper article about the robbery and killing. He stated that the two men being sought were Wilkinson and himself, but contended that the story exaggerated the amount of money they had obtained from the robbery. On cross-examination by defendant McGautha's counsel, Miss Dupree admitted that she had been promised immunity from prosecution and that at the time of the robbery Wilkinson was her boyfriend.

John Watkins testified that he had driven the defendants from Los Angeles to Bakersfield about one week after the robbery. He indicated that during the trip McGautha stated

that a man had been killed in order to save Wilkinson's life. Watkins gave inconsistent testimony as to whether McGautha admitted the shooting, but he was certain that one of the defendants had made such an admission.

Kaye Druley, a police ballistics expert, testified that the bullet that killed Mr. Smetana had been fired from the .38 revolver introduced as People's exhibit No. 3. Miss Dupree testified that McGautha's gun resembled exhibit No. 3, but Mrs. Lock stated that the gun used by Wilkinson resembled the .38 in question. Mr. Druley further indicated that the fatal shot might have been fired from either of the points in the store where Mrs. Smetana stated the robbers were standing when her husband was shot.

(c) *The penalty trial:* At the penalty phase defendant Wilkinson testified in his own behalf. He stated that he had come to California from Mississippi in 1960, and had lived at first with a Baptist minister. During most of the period prior to the robbery he had been gainfully employed and had been sending money to his family in Mississippi. He admitted that he had committed the robberies, but insisted that he had done so only with great reluctance and at McGautha's and Fannie Lue Smith's urging. Wilkinson stated that the only gun he had ever owned was a .32, and that although he had the gun with him at the Smetana store he had never fired it. He contended that, while he was holding the customer, McGautha had hit Mrs. Smetana and shot her husband.

Several character witnesses, including a Baptist minister, testified on Wilkinson's behalf. They stated that he had a good reputation, was not a violent person, and had regularly attended church until he met McGautha and Fannie Lue Smith. Sergeant Richard Sullican testified that after his arrest Wilkinson had cooperated fully with the police and answered all their questions.

McGautha also testified in his own behalf. He stated that he had owned a .38 revolver, but that he had lent it to Wilkinson during the Smetana robbery. He further contended that it was Wilkinson who struck Mrs. Smetana and killed her husband while he, McGautha, was holding the customer. He expressed regret over Mr. Smetana's death. McGautha admitted prior Texas convictions for robbery and manslaughter, but maintained his innocence of the crimes involved. He denied that he had told Miss Dupree that he had shot anyone.

2. *Defendant McGautha was not denied his right to a fair and impartial jury.*

The trial court excused for cause eight prospective jurors and one prospective alternate juror because of their opposition to the death penalty. Defendant McGautha contends that their exclusion was in violation of the standards set out in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and thus deprived him of a fair and impartial jury. We conclude, however, that the *Witherspoon* requirements, as interpreted by this court, were met by all nine excused jurors.

*Witherspoon* holds that a "sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scuples against its infliction." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].) The court excepted from this ruling only prospective veniremen who "made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." (*Id.,* p. 522, fn. 21 [20 L.Ed.2d p. 785].)

Six of the prospective jurors and the excused prospective alternate indicated either that they could conceive of no case in which they would vote for the death penalty, or that they could not vote for the death penalty under any circumstances.[1] Such a statement satisfies the requirements of *With-*

---

[1]Those seven prospective jurors testified in part as follows:

(a) "THE COURT: You raised your hand in response to that question and I presume that you then feel that you do entertain a conscientious feeling pertaining to the death penalty; is that correct?

"PROSPECTIVE JUROR FISCHKES: Yes, sir.

"THE COURT: And that is a conscientious feeling that you are so strong that you feel that under no circumstances in any type of case would you ever vote or render that type of a punishment; is that correct?

"PROSPECTIVE JUROR FISCHKES: Yes, sir, I couldn't give that."

(b) "PROSPECTIVE JUROR SIPORIN: Yes, I am absolutely against capital punishment.

"THE COURT: And this is a conviction that is so strong in your mind that you feel that under no circumstances in any type of case would you ever vote to render that type of penalty.

"PROSPECTIVE JUROR SIPORIN: Absolutely, yes."

(c) "THE COURT: And you feel that under no circumstances in any type of a case could you ever be called upon to so vote for that type of punishment; is that right?

"PROSPECTIVE JUROR MCDONALD: That is correct."

(d) "THE COURT: I take it then, Mr. Richards, your conscientious objection to the death penalty is of such a nature that you cannot con-

*erspoon.* The exclusion of the two other prospective jurors presents a more complicated problem, since they stated instead that they would not vote for the death penalty in a "proper case." (See *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 516 fn. 9 [20 L.Ed.2d 776, 781, 88 S.Ct. 1770].) Viewing the questioning of the two jurors, however, within "the entire context of the examination and the full setting in which it was conducted" (*People* v. *Varnum* (1969) *ante,* pp. 493, 480 [75 Cal.Rptr. 161, 450 P.2d 553]), we explain why the exclusion of those jurors appears proper.

After the first 12 veniremen were seated in the jury box, the trial court twice instructed the jury that the law "places in the hands of the jury the question of the proper penalty or punishment to be administered where the finding of the jury is that the murder is murder in the first degree," and that the jury would be required to decide in such a case between the imposition of death and life imprisonment. The court then asked, "Is there anyone now in the jury, any of the twelve of you, that entertains such a feeling to the death penalty that you feel under no circumstances in any type of case could you ever vote and render that type of punishment?" After prospective juror Fischkes had been excused for cause, the court questioned Mrs. Verna Rounsley. "Mrs. Rounsley, you raised your hand as well. PROSPECTIVE JUROR ROUNSLEY: Rounsley. THE COURT: Mrs. Rounsley, is that your feeling as well? PROSPECTIVE JUROR ROUNSLEY: Yes, sir. THE COURT: In other words, you entertain, Mrs. Rounsley, a conscientious feeling pertaining to the death penalty which is in the nature of a conscientious scruple against it to the extent that you feel you could not render that type of a punishment if called upon to do

---

ceive of any type of case, if called upon to do so, that you could vote for this type of punishment; is that correct?

"PROSPECTIVE JUROR RICHARDS: That is correct."

(e) "THE COURT: Your state of mind is that you entertain a conscientious objection to the death penalty which is so strong that you feel under no circumstances in any type of case could you ever vote that type of penalty?

"PROSPECTIVE JUROR HALE: No."

Since the court excused Mrs. Hale immediately after this "No," she must have indicated by her tone of voice that she meant, "No, not under any circumstances."

(f) "THE COURT: Do you feel under no circumstances could you ever vote that type of penalty in any type of a given case; is that correct?

"PROSPECTIVE JUROR UMSTED: That's correct."

(g) "THE COURT: And that objection to the death penalty is such that in your present frame of mind you could not conceive of any type of a case where you would ever vote for that type of penalty; is that correct?

"PROSPECTIVE ALTERNATE JUROR BROWN: Right."

so in a proper case; is that right? PROSPECTIVE JUROR ROUN-
SLEY: Yes. THE COURT: All right, I will excuse you, then, for
cause, Mrs. Rounsley.''

Although the court's statement that the penalty was in the
hands of the jury may have conveyed to Mrs. Rounsley that
the law itself supplies no definition of ''a proper case,'' we
need not rely on this point. When the court asked, ''Is that
your feeling as well,'' Mrs. Rounsley must have understood
the word ''that'' to refer either to the question asked of all
12 jurors at once, or to the question asked to Miss Fischkes
quoted in the margin *supra*. Since an affirmative answer to
either of these very similar questions would have warranted
the court's excusing Mrs. Rounsley for cause, the require-
ments of *Witherspoon,* as explained in *Varnum,* are satisfied.

The exclusion of Mrs. Helen Wilson can similarly be justi-
fied by reference to the context of her remarks. The complete
*voir dire* of Mrs. Wilson is set out in the margin.[2] Her exclu-

---

[2]''BY THE COURT:

''Q. Mrs. Wilson, you have been able to hear the proceedings as you
sat in the back of the courtroom; is that correct?

''A. Yes, sir.

''Q. Calling your attention, first, to the nature of this litigation, do
you know of any reason why you could not sit on a case of this nature?

''A. I don't think I could conscientiously impose the death sentence.

''Q. You say that you don't think that you could?

''A. I know I couldn't.

''Q. Is this based upon a conscientious objection to the death penalty?

''A. Yes, sir.

''Q. And, then, your present frame of mind, Mrs. Wilson, is such, as
I understand it, that you could not conceive of any type of a case, if you
were called upon to sit on, where you would impose the death penalty;
is that correct?

''A. I wouldn't want to sit on that type of a case and I couldn't.

''Q. Well, it is a question initially told the other members of the jury,
Mrs. Wilson, of a natural reluctance on the part, I think, of any of us
to avoid a task such as twelve jurors in a courtroom may be called upon
to perform.

''I want you to understand, and everyone else to clearly understand
that at this point we know nothing about this case whatsoever. All we
know is that the case has been filed, that there are three counts in the
Information charging two counts of robbery and one count of murder,
but I know as a lawyer, and counsel knows as well, that when the charge
is murder there is a possibility that we will get into a second phase of
the trial.

''Now, it is an unpleasant thought at best to think that we will have
to sit here at one time and make that determination. . . .

''. . . . . . . . . .

''Now, the other side of it is, as I indicated, that there are people who
do entertain a conscientious objection to the death penalty, which is so
strong that, for example, it would preclude them from ever rendering a
verdict of guilty, say, of murder in the first degree because they would
know if they did that they would have to, for example, get into the second
phase of the trial.

''There are also people who have such a frame of mind pertaining to

sion, if warranted, must rest upon her statement that she could not vote for the death penalty in a proper case.

We cannot conclude beyond the possibility of doubt that Mrs. Wilson correctly understood the phrase "proper case" as used by the court merely because two days before the court had stated that the law placed the decision as to penalty in the hands of the jury. Only a few moments earlier, however, the following discussion had transpired between the prosecuting attorney and another prospective juror. "Q. It has been suggested, I'm afraid, during the discussions of counsel that all you have to do is follow the law and follow the evidence and inevitably you will arrive at a just verdict, but you are aware that in the penalty phase of a case involving capital punishment there is no law to guide you in what is a proper case? Did you know that? A. Yes. Q. The law doesn't say if you find these facts then this is a proper case for the death penalty. You are going to have to look to your conscience and the circumstances and decide in your own mind whether this is a proper case; do you understand that? A. Yes. Q. And you won't get any help from the law. . . . Q. . . . Now, knowing that the law is not going to help you in determining what is a proper case do you still think you can be fair to the People and fair to the defendants? A. Yes."

Although the prosecuting attorney is not authorized to

---

the death penalty where they entertain a conscientious objection to it and under no circumstances would they ever vote to impose that type of penalty.

"Now, both sides to this litigation have the right to know at this time your frame of mind, but I want you to draw a distinction between a conscientious objection to the death penalty and a desire to do something other than sit on this case, because it takes a long tedious process to select twelve jurors who can perform this task, so it is not a matter that you might not want to do it, but I suggest to you and submit to you that you have an obligation as a juror of this court to sit on cases when called upon to do so.

"Now, in light of those remarks, is it your frame of mind that you just don't want to sit on this case or is your frame of mind such that you entertain a conscientious objection to the death penalty?

"A. I have a conscientious objection.

"Q. I didn't hear you.

"A. I have a conscientious objection.

"Q. To the death penalty?

"A. Yes.

"Q. And that is of the nature that you could not in any circumstances vote in a proper case that type of punishment; is that correct?

"A. That is correct.

"THE COURT: All right, Mrs. Wilson, thank you. I will excuse you from service on this case."

instruct the jury as to the law of California,[3] Mrs. Wilson almost certainly must have accepted this explanation in the light of the failure by either the trial court or the defense attorneys to question its accuracy. Within this context Mrs. Wilson's statement that she could not impose the death penalty in a proper case made it unmistakably clear that she would automatically vote against the death penalty in every case.

3. *Defendant McGautha was not prejudiced by the introduction of prior inconsistent statements to prove the truth of the matter stated.*

 Witness Watkins testified that during the trip to Bakersfield defendant McGautha had stated that some man had been "aiming down" at defendant Wilkinson, and that "he chose his life instead of Rodney's." Although this assertion suggested that the unidentified man had been killed to save Wilkinson, it left unclear the identity of the "he" who chose to protect Wilkinson in that manner. Watkins responded to this ambiguous statement by asking, "You really shot the guy?", to which one of the defendants answered, "Yes." When questioned by the prosecution Watkins stated that he did not know which defendant had given the "Yes" answer.

Subsequently, however, the prosecution introduced the following testimony of Watkins from the preliminary hearing regarding Dennis McGautha's statements: "THE WITNESS: Then I asked, 'What, Man, what happened?' And he said, 'This guy, you know.' Q. Who were you asking? THE WITNESS: Talking to Dennis, and he said, 'This guy,' nothing more was said about that. And I said, 'Well, did you kill him?' He said, 'Yes I think I did.' " At the time of the trial section 1235 of the Evidence Code permitted the introduction of prior inconsistent statements for the truth of the matter stated, and the court gave no instruction limiting the use of this prior testimony to impeachment purposes. For felony murder purposes it would not matter which of two armed robbers actually shot the victim. At the penalty phase, however, since the jury may have sought to inflict the death penalty only on the robber who actually pulled the trigger, this testimony

---

[3]The prosecuting attorney made a similar comment in argument at the penalty trial. "You will recall on voir dire each of you was asked whether or not you could impose that penalty in a proper case and at that time you probably had no notion of what constituted a proper case and you probably expected that you would get some guide lines from the Court, but you are going to find those guide lines are few."

might well have played a role in the jury's deliberations, and may thus have adversely affected defendant McGautha.

In *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], we declared Evidence Code section 1235 unconstitutional insofar as it provides for the admission against a criminal defendant of prior inconsistent statements for the purpose of showing the truth of the matter therein stated. *Johnson* dealt with prior inconsistent statements rendered before a grand jury in the absence of the defendant, of his counsel, or of the ultimate trier of fact. In *People* v. *Green* (1969) *ante*, p. 654 [75 Cal.Rptr. 782, 451 P.2d 422], we applied *Johnson* to prior inconsistent statements given at a preliminary hearing, notwithstanding the defendant's right to cross-examination at that hearing. Accordingly, the introduction of Watkin's previous testimony appears to constitute error under *Johnson*.

*Johnson* errors, however, are not prejudicial per se; we must inquire, rather, whether the use of the prior inconsistent statements was ''harmless beyond a reasonable doubt.'' (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824].) In the instant case, subsequent testimony by Watkins rendered the use of his prior statements harmless within the meaning of *Chapman*. Some time after the introduction of those statements counsel for defendant Wilkinson cross-examined Watkins. ''Q. And Dennis, when you asked him point blank, 'Well, did you kill him?' he said, 'Yes, I think I did.' Was this asked of Dennis, and was that the answer that he gave in the car? A. Read it again, please, one time. Q. 'I said, ''Well, did you kill him?'' He said, ''Yes, I think I did.'' ' A. Yes.'' This change in Watkins's position presented counsel for defendant McGautha with an opportunity to cross-examine Watkins in the presence of the jury as to the identity of the party answering ''Yes.'' Counsel for McGautha declined further to examine Watkins, and he was excused.

In this case, unlike *People* v. *Green,* Watkins's identification of McGautha was subject to cross-examination at a time when the ultimate trier of fact observed Watkins's demeanor, and when McGautha's counsel was concerned with actual guilt and not its mere probability as at a preliminary hearing. If counsel for McGautha had succeeded in discrediting the identification at trial, we have no reason to believe that the jury would nonetheless have given credence to the testimony at the preliminary hearing. Conceivably, under special cir-

cumstances not present here, the ability to cross-examine the statement at trial would not be sufficient to overcome the error of admitting similar prior statements to prove their truth. In the case at hand, however, we cannot reasonably doubt that McGautha's inability to cross-examine the earlier identification in the presence of the jury did not contribute to the verdict obtained.

4. *The record does not support a conclusion that the jury, in fixing McGautha's penalty, erroneously considered the possibility of his parole.*

■ Prior to the commencement of deliberations by the jury at the penalty trial, the trial court gave no instructions concerning the possibility of parole. Approximately two hours after the commencement of those deliberations the foreman of the jury sent the judge a note which read as follows: "A note from instructions. 'Confinement in the state prison for life.' Does this mean that there is no possibility of parole?" Defendant McGautha contends that this question demonstrates that the jury gave consideration to whether a life sentence involved the possibility of parole.

In response to the jury's inquiry, however, the court gave the precise instruction with regard to the possibility of parole spelled out and approved in *People* v. *Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]. We cannot assume that the jury's request for a further instruction demonstrates their reluctance or refusal to follow the rendered instruction.

In *Morse* itself we covered exactly this sort of inquiry. "In evolving a proper instruction for the jury, we recognize that individual jurors often entertain some ideas of parole laws and might erroneously consider the effect of such laws upon a term of life imprisonment. *They may ask the trial judge for information upon the subject*; it is not enough for the trial court merely to refuse the request and relegate them to ignorance. *To avoid such unanswered queries* and to prevent latent misconceptions, we believe the trial court, at the time of rendition of all instructions, should inform the jury in general terms that life imprisonment can result in parole but that such matters are of no concern to it." (*People* v. *Morse, supra,* 60 Cal.2d 631, 647.) (Italics added.) The trial court should, of course, have given the *Morse* instruction before the jury commenced their deliberations, but we do not believe that the mere delay could have affected the jury's decision.

*5. Defendant McGautha was afforded the effective assistance of counsel at trial.*

█ Defendant McGautha complains on appeal of the conduct of his counsel at trial. Although McGautha's counsel on appeal suggests improvements that might have been made in the conduct of the trial, the record does not indicate that the trial counsel exhibited such incompetence or lack of diligence as to reduce the trial to a farce or sham. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

McGautha first urges that a more vigorous defense, "relying heavily on the dangers of circumstantial evidence, the strength of the presumption of innocence, and the existence of a reasonable doubt about the identification of McGautha" might have produced an acquittal or at least a lesser penalty. █ So general an objection can hardly warrant reversal; in inquiring whether defendant received his constitutional right to "effective aid in the preparation and trial of the case" (*Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 172, 53 S.Ct. 55, 84 A.L.R. 527]) we do not attempt to measure such elusive quantities as the vigor of a defense counsel's efforts.

█ McGautha further complains about the following remarks in his trial counsel's argument to the jury at the guilt phase: "[U]nless you give these poor slob-type defendants the utmost consideration on every point . . . unless you give them every consideration to find these defendants not guilty, would not be shameful in and of itself. To do anything that is unconscionable or to give them every consideration, inasmuch as you are sitting as judges, that would be shameful. I'm not telling you to acquit them. I'm saying the responsibility is yours, and it will depend upon how you view the evidence. . . . If you believe sincerely, sincerely, ladies and gentlemen of the jury, that the People have met their responsibility, that quantum of proving the defendants guilty beyond a reasonable doubt, I join. My client and I will thank you for your attention."

Trial counsel certainly did not err in telling the jury that the final responsibility for finding guilt or innocence rested with it, or in stating that counsel and McGautha would accept the jury's verdict whatever it might be. If counsel had insisted in the face of very weighty evidence of guilt that McGautha be acquitted, counsel might well have impaired his

credibility at the penalty phase. The reference to McGautha and Wilkinson as ''slob type defendants'' does appear harsh, but counsel may have made the remark to elicit some feeling of sympathy from the jury. Counsel's somewhat awkward grammar beclouds his position as to whether or not the defendants deserved every consideration, but neither bad grammar nor debatable trial tactics constitute a deprivation of the effective assistance of counsel. Although, after the jury had already reached its own determination of guilt, counsel conceded McGautha's guilt at the penalty trial, such strategy obviously did not relate to the guilt trial and cannot be condemned as an unreasonable tactic in the penalty phase.

*People* v. *Davis* (1957) 48 Cal.2d 241 [309 P.2d 1], relied on by defendant McGautha, dealt with very different conduct. In *Davis* trial counsel suffered a nervous breakdown after his closing argument. Upon obtaining permission to supplement his argument, he proceeded to destroy his client's defense. Although he had at first vigorously attacked the credibility of a key prosecution witness, counsel, in his supplementary argument, recanted most of his criticisms. Referring to a number of incriminating ''facts'' not contained in the record, counsel undermined Davis's defense of alibi by stating his personal opinion that Davis had been present at the time of the alleged robbery and murder. The instant case presents no such extraordinary and highly prejudicial conduct.

6. *Defendant Wilkinson waived his right to object on appeal that extrajudicial statements of McGautha were introduced against him.*

 At several points in their testimony, witnesses Watkins and Dupree recounted defendant McGautha's statements to them which tended to incriminate defendant Wilkinson.[4] Since McGautha did not take the stand at the guilt phase, counsel for Wilkinson could not cross-examine McGautha as to such accusations. Whenever counsel appropriately so requested, the court instructed the jury that it should not consider the challenged McGautha statement as evidence against defendant Wilkinson. Counsel for defendant Wilkinson did not so challenge all of McGautha's extrajudicial statements, however, and the court gave no general limiting instruction with regard to these statements.

In *Bruton* v. *United States* (1968) 391 U.S. 123 [20

---

[4]McGautha's statements indicated that he and Wilkinson had been involved in a robbery of the Smetana store during which a man had been shot.

L.Ed.2d 476,' 88 S.Ct. 1620], the Supreme Court held that extrajudicial statements of one defendant which tended to incriminate a codefendant could not be introduced at their joint trial, notwithstanding the giving of an appropriate limiting instruction. The introduction of McGautha's statements thus violated *Bruton.* We conclude, however, that Wilkinson waived this objection by failing to attempt to exercise his rights under *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].

In *Aranda* we held that, if the prosecution proposes to introduce an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of three procedures. "(1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531.)

In the instant case, tried two years after *Aranda,* the prosecution called both Watkins and Dupree at the preliminary hearing and questioned them as to McGautha's extrajudicial statements. This inquiry apprised defendant Wilkinson of the prosecution's probable tactics at trial, and a motion for severance under *Aranda* would have been appropriate. For reasons not apparent on the face of the record the trial court did grant a motion to sever the trial of another codefendant, Fannie Lue Smith. Defendant Wilkinson, however, neither sought a severance nor requested the deletions and exclusions authorized by *Aranda.* Having failed to exercise his right to bar the introduction of incriminating extrajudicial statements by McGautha, defendant Wilkinson cannot now complain of any resulting prejudice.

Clearly, the evidence in this case sufficiently supported both armed robbery convictions; the record also sufficiently supported a first degree murder conviction under the felony-murder rule. In *In re Anderson* (1968) 69 Cal.2d 613 [73. Cal.Rptr. 21, 447 P.2d 117], we considered and rejected McGautha's constitutional criticisms of the death penalty and the procedures under which it is imposed. *Witherspoon* itself

rejected the contention that a jury passing on guilt in a capital case could not be limited to veniremen willing to consider imposing the death penalty. (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 516-518 [20 L.Ed.2d 776, 782-783, 88 S.Ct. 1770].) The trial having been conducted without prejudicial error, we must hold that the convictions and sentences of both defendants should be affirmed.

The judgments are affirmed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

The petition of appellant McGautha for a rehearing was denied May 14, 1969. Peters, J., was of the opinion that the petition should be granted.