Filed 10/19/20  P. v. Gutierrez CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL GUTIERREZ,<br><br>Defendant and Appellant. | F078464<br><br>(Super. Ct. No. BF171041A)<br><br>**OPINION** |

<u>THE COURT</u>*

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*        Before Poochigian, Acting P.J., Franson, J. and Meehan, J.

Defendant Miguel Gutierrez stands convicted of false imprisonment and possession of a firearm by a felon. On appeal, he contends (1) the evidence was insufficient for the jury to find that he possessed a firearm for the benefit of a gang, and (2) defense counsel was ineffective for conceding that he possessed a firearm for the benefit of a gang. We affirm.

## PROCEDURAL SUMMARY

On April 12, 2018,[1] the Kern County District Attorney charged defendant with attempted robbery (Pen. Code, §§ 664, 212.5, subd. (c);[2] count 1), kidnapping (§ 207, subd. (a); count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), and active participation in a criminal street gang (§ 186.22, subd. (a); count 4). As to counts 1, 2, and 3, the information alleged that defendant committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). As to counts 1 and 2, the information alleged that defendant was a principal in the offenses and that at least one principal personally used a firearm (§ 12022.53, subds. (b), (e)(1)). As to counts 3 and 4, the information alleged that defendant personally used a firearm during the commission of the offenses (§ 12022.5, subd. (a)).

On September 14, the jury found defendant not guilty on counts 1 and 4. On count 2, the jury found defendant not guilty of kidnapping but guilty of the lesser included offense of false imprisonment (§§ 236, 237, subd. (a)). As to count 2, the jury found true that defendant personally used a firearm in the commission of the offense but found not true that he committed the crime for the benefit of a criminal street gang. The jury found defendant guilty on count 3 and found true that he committed the offense for the benefit of a criminal street gang and personally used a firearm in the commission of the offense.

---

[1] All further dates refer to the year 2018 unless otherwise stated.

[2] All further statutory references are to the Penal Code.

2.

On November 7, the court sentenced defendant to a total term of 13 years in prison as follows: on count 2, three years, plus a consecutive 10-year firearm enhancement; and on count 3, three years, plus a consecutive four-year gang enhancement, both stayed pursuant to section 654. The trial court struck the firearm enhancement on count 3.

Defendant filed a notice of appeal on November 19.

## FACTUAL SUMMARY

### I.      Prosecutor's Case

*Lopez's and the Officers' Accounts*

José Lopez met Stephanie Quiroz through social media on January 22. That day, they met to smoke at "the Bluffs" in Bakersfield. The following day, on January 23, while Lopez was at home in Wasco, he and Quiroz messaged about "hang[ing] out" and smoking again. Quiroz asked Lopez to pick her up and Lopez agreed. Between roughly 9:00 p.m. and 11:00 p.m., Lopez drank 10 to twelve 12-ounce beers and smoked a gram of marijuana. During that time, Lopez drove from his home in Wasco to a fast food restaurant on the east side of Bakersfield to use free wireless internet because his cell phone did not have service. At about 10:00 p.m. or 11:00 p.m., Lopez messaged Quiroz again from his vehicle outside the fast food restaurant to confirm the location that he would pick her up.

When he arrived to pick Quiroz up at around 11:00 p.m. or midnight, he honked his horn and waited for her to come to the vehicle. However, when she came to the vehicle, she was not alone as he had expected. After she opened the passenger door of the two-door vehicle, defendant and Selvestre Ortega—neither of whom Lopez knew— "rushed into the backseat." Lopez asked Quiroz who those two men were. She told him they were her friends and they were all going to smoke together, and she got into the vehicle. Lopez said he was not comfortable with the men being in his vehicle. In response, defendant, who sat in the rear passenger seat, put a gun to Lopez's head and told him "[t]o drive off on East Side Bakers." Defendant then gave Lopez directions and

3.

Lopez drove. Lopez testified that he "felt like … [he] had to do it" because defendant had a gun to his head. Lopez did not know what defendant meant when he said "drive off on East Side Bakers," but he believed that East Side Bakers was a gang. Lopez testified that he was not affiliated with a gang.

As Lopez drove, Quiroz asked him what kind of shoes he was wearing. Based on that question, Lopez believed that Quiroz, defendant, and Ortega were going to rob him.

Meanwhile, at roughly 1:00 a.m., Kern County Sheriff's Sergeant Adrian Olmos conducted a traffic stop near Heritage Bible Church. California Highway Patrol Officer José Bravo and another highway patrol officer assisted with the stop.

Back in the vehicle, defendant continued to hold the gun to Lopez's head and direct him as he drove south, in the direction of Heritage Bible Church. As Lopez drove, he saw the law enforcement vehicles by the church. With his right hand, Lopez grabbed the barrel of defendant's gun to move it away from his head. With his left hand on the steering wheel, Lopez made a U-turn and attempted to drive toward the officers for help. When Lopez slowed down to make the U-turn, Quiroz jumped out of the vehicle.

As Olmos stood by his patrol vehicle writing a statement of his observations, he "heard a loud vehicle like it was revving its engine" coming from the west. A short while later, he heard the loud engine again and saw Lopez's vehicle about 20 to 40 feet away and coming directly toward him very quickly. As Lopez drove toward the officers, he lost control of the vehicle. Olmos pressed himself against his patrol vehicle and the vehicle drove past him, missing him by only several feet. The vehicle then made a turn, continued toward the Heritage Bible Church, and collided into the church's northwestern building.

Defendant and Ortega immediately exited the vehicle through the passenger door and fled. Defendant ran westbound, across the street, toward Heritage Park. Olmos followed in his vehicle. As Olmos closed the distance, defendant "laid down in a prone position … [with] his arms out as if he was giving up." Olmos then arrested him. As

4.

Bravo approached the vehicle, Ortega ran north and jumped over a fence that was topped with barbed wire. As Bravo continued toward the vehicle, Lopez exited through the driver side door and "yell[ed] '[t]hey have a gun.' " Bravo commanded Lopez to get on the ground and Lopez complied. He did not try to run.

After detaining Lopez, Bravo searched the vehicle and found a .30-.30 rifle (the rifle) in the front passenger area. When Olmos searched defendant, he found a cloth pouch in his right front pocket containing 12 live rounds of .30-.30 ammunition.

Lopez explained to the officers that Quiroz " 'set [him] up' " and he was not trying to hurt Olmos. He offered to show officers his text message conversation with Quiroz.

***Defendant's Account***

Kern County Sheriff's Deputy Luis Almanza interviewed defendant in the parking lot of Heritage Bible Church while defendant was detained in the back seat of a patrol vehicle and again at Kern Medical Center. The interview conducted at Kern Medical Center was recorded and was played for the jury.

Defendant told Almanza that he was homeless and stayed at his friend's house the evening of January 22. The following day, defendant stayed at his friend's house all day until Lopez picked him up at about 1:30 a.m. on January 24. Before Lopez picked him up, they had met once before at a party. When defendant got into the vehicle with Lopez, he told Lopez he was " 'just tryin' to get home' " to his sister's house. While defendant was in Lopez's back seat, Lopez began "disrespecting" him and the two argued. As the vehicle approached Olmos and the California Highway Patrol officers, Lopez made a U-turn, drove toward the officers, and said, " 'We're gonna die together. F*** it.' " Ortega "jumped in the front and … tried to turn [the steering wheel]" away from the officers. Once the vehicle crashed, defendant exited the vehicle through the passenger door and ran.

Defendant told Almanza that the rifle was a sawed-off .30-30 that was lent to him by a "homie [who] don't bang …." He had seen the rifle before and so he asked his

5.

"homie" if he could borrow the rifle for "protection" because his "whole neighborhood [had] turned on [him]." Along with the gun, defendant also received a black pouch of ammunition but he did not know how many rounds it contained.

***Ortega's Account***

Ortega testified upon grant of immunity. He testified that he knew defendant because defendant dated his sister. He knew Quiroz because she dated his "homie," and she had also dated defendant. Ortega had seen Lopez approximately five times at parties before but did not know him.

Ortega was in Lopez's vehicle with Quiroz and defendant when Lopez crashed. Quiroz, defendant, and Ortega had text messaged each other earlier in the day. Ortega told Quiroz that he wanted " 'a ride to the smoke shop' " and Quiroz responded that she was with someone who would drive them to the smoke shop. Roughly 20 or 30 minutes later, at about 11:00 p.m. or midnight, Ortega and defendant walked out of a house to the vehicle, Quiroz exited the vehicle, Ortega and defendant got into the back seat, and Quiroz got back into the front seat. Ortega then asked Lopez to take them to the smoke shop. Lopez initially refused because he already had marijuana. Ortega told Lopez that he wanted marijuana for later and Lopez agreed to drive them to the smoke shop. No one in the vehicle gave Lopez directions because he already knew how to get to the smoke shop. After Lopez had driven for several minutes, defendant removed the rifle that he had "stuffed … down his left pant leg." Lopez saw the rifle, but defendant did not point it at him.

No one in the vehicle planned to rob Lopez and at no point did Ortega, defendant, or Quiroz attempt to rob him. However, during the drive, Quiroz asked Lopez, " '[W]here my shoes at?' " An argument broke out between Quiroz and Lopez over the shoes. Quiroz told Lopez the shoes were expensive, and Lopez said he did not know where they were. Based on the conversation, Ortega understood that the shoes belonged to Quiroz. Defendant told Lopez, " 'Don't talk to her like that. She's a girl with you,

6.

boo.' " Although defendant appeared angry because of how Lopez spoke to Quiroz, he did not point the rifle at Lopez. The argument concluded before Ortega saw the law enforcement vehicles.

When Lopez began driving toward the officers, defendant did not have the rifle pointed toward him and Lopez had not grabbed the barrel of the rifle. Neither Ortega nor defendant attempted to grab the steering wheel. Once Lopez crashed, defendant moved the rifle so he could exit the back seat. Defendant exited through the passenger door and then Ortega exited through the same door. When Ortega exited, the rifle was in the back seat.

### Gang Evidence

Kern County Sheriff's Deputy Adam Tinoco was a member of the Gang Unit. He testified that the East Side Bakers gang was a primarily Hispanic southerner gang in Bakersfield, affiliated with the Mexican Mafia prison gang. The territory claimed by the East Side Bakers included the area where Lopez picked up Quiroz, Ortega, and defendant, and the Heritage Bible Church where the crash took place. Illegal possession of a firearm and assault with a deadly weapon were among the primary activities of the East Side Bakers gang.

Tinoco testified that possession of firearms is important to gang members generally because they "can be used [for] offensive and defensive purposes such as … use [of] a firearm to … commit a robbery, … a carjacking, [or] … a[n] assault with a deadly weapon." Gang members also use weapons to protect themselves—"[i]f [gang members] are out on the streets and a rival gang member comes and tries to assault [them], [they] can use that firearm [for] a defensive purpose."

During defendant's interview with Almanza, defendant acknowledged that the East Side Bakers gang was a Sureño gang. He told Almanza that he was an "unactive" East Side Bakers gang member but not a gang "drop out." When defendant was an active gang member, he went by the nickname "Temper." Defendant further told Almanza that

7.

in jail he would be housed with the general population and not in protective custody. Almanza and Tinoco both testified that gang dropouts are typically booked into protective custody so they are protected from attacks by active gang members. But active gang members typically request booking in general population if they are on good terms with the gang.

Defendant had the words "Evil Side" tattooed above his eyebrows and three dots tattooed to the left of his left eye. On his right wrist, defendant had tattoos of the letters "ESP" and the name "Renato." On his left wrist, defendant had tattoos of the letters "KC" and "MOB" and three dots. On his right arm, defendant had a tattoo of praying hands and a rosary with a cross. The letters "ES" were tattooed on the cross. On his left arm, defendant had a tattoo that spelled out "Gutierrez" and a street sign that said "East Side." Tinoco testified that the three-dot tattoo displayed both on defendant's left wrist and near his left eye was a traditional southern Hispanic gang tattoo. Similarly, the "Evil Side" tattoo above defendant's eyebrows and the "ESB" tattoo on his right wrist were related to the East Side Bakers gang. The "KC" tattoo near defendant's left wrist indicated that he "represent[ed] for Kern County."

Kern County Sheriff's Homicide Detective Daniel Perez searched the Facebook profiles belonging to defendant, Ortega, and Lopez. On defendant's Facebook page, Perez found multiple photographs of defendant "throwing up … a gang sign." In at least two of those photographs, defendant was holding a firearm that appeared similar to the rifle. One of those two photographs bore the caption "East Pride." In another of the photographs, defendant had a firearm tucked into the waistband of his pants. On Ortega's Facebook page, Perez found photographs of defendant and Ortega displaying gang signs and a photograph of defendant or a man who looked like defendant displaying a gang sign and standing with Quiroz. Tinoco testified that the hand gestures that defendant displayed in the photographs were gang signs associated with the East Side Bakers gang.

8.

In light of the evidence admitted, Tinoco opined that defendant was an active East Side Bakers gang member on January 24.

When Ortega was asked about defendant's gang membership, he initially testified that defendant was not a gang member and had never told Ortega that he was a gang member, but Ortega eventually acknowledged that defendant was "a member of East Side." Ortega denied being a gang member himself but acknowledged that he "h[u]ng out" with East Side Bakers gang members. Ortega acknowledged that he held a gun and made hand signs for East Side Bakers in photographs on his Facebook page. But he denied knowing the meaning of the hand gestures that defendant made in the photographs they posed for together.

Perez testified that defendant made calls from jail. In one call, defendant twice told an unidentified man to "ease up." Tinoco testified that the phonetic transcription of "ease up" was an error: "So the term ease up is not e-a-s-e. Ease up is for the letter E." Tinoco testified, "When an East Side Baker gang member says ease up, especially if he is in custody at that time, … he is showing that even though he is considered down and out, … he still represents as being his E still being up, that he still represents for the gang."

In response to a hypothetical question reflecting the facts of this case, Tinoco opined that the crimes were committed in association with and for the benefit of the East Side Bakers gang because two gang members came together to commit a robbery, while one possessed a firearm and promoted the gang by saying "East Side Bakers." Tinoco opined that possession of a firearm was a primary activity of the East Side Bakers.

***DNA Evidence***

DNA samples were taken from the grip, trigger, housing group, bolt, front grip stock, and barrel of the rifle. "When compared to [defendant's] DNA, a match between the DNA from the grip of the rifle was 44 trillion times more likely to belong to [defendant] than a random person of Hispanic descent." "When compared to [defendant's] DNA, a match between the DNA from the bolt handle of the rifle was

2.4 quadrillion times more likely to belong to [defendant] than a random person of Hispanic descent."  "When compared to [defendant's] DNA, a match between the DNA from the trigger of the rifle was 110 septillion times more likely to belong to [defendant] than a random person of Hispanic descent."  "When compared to [defendant's] DNA, a match between the DNA located on the [front grip] stock was 610 quadrillion times more likely to belong to [defendant] than a random person of Hispanic descent."  "When compared to … Lopez's DNA, a match between the DNA located on the [front grip] stock was 110,000 times more likely to belong to … Lopez than a random person of Hispanic descent."

## DISCUSSION

### I.  Sufficiency of the Evidence

Defendant first contends that the evidence presented in support of the gang allegation on count 3, possession of a firearm by a felon, was constitutionally insufficient to sustain the true finding.  Specifically, defendant argues that the evidence was insufficient to show either that he possessed the rifle (1) in association with or to benefit the East Side Bakers gang or (2) with the intent to promote, further, or assist criminal conduct by East Side Bakers gang members.  The People disagree.  We conclude the true finding on the gang allegation on count 3 was supported by sufficient evidence.

#### A.  Standard of Review

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could have found the [enhancement true] beyond a reasonable doubt."  (*People v. Cole* (2004) 33 Cal.4th 1158, 1212; accord *People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*) [the same standard applies when a

10.

defendant challenges the sufficiency of the evidence to support an enhancement].) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) It is well settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

### B.    Relevant Law

The gang enhancement under section 186.22, subdivision (b)(2) punishes gang-related crimes that are committed with the specific intent to aid crimes by gang members. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138.) Among other things, a prosecutor must prove these two prongs beyond a reasonable doubt: (1) that the underlying crime was "gang-related" because the defendant committed it "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that he committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at p. 59.)

Expert opinion that particular criminal conduct benefits a gang can be sufficient to support both prongs of a gang enhancement. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see *Albillar*, *supra*, 51 Cal.4th at p. 63 ["[e]xpert opinion that particular criminal conduct benefited a gang … can be sufficient to raise the inference that the conduct was 'committed for the benefit of … a[] criminal street gang' within the meaning of section 186.22[, subdivision] (b)(1)"].) But, such expert testimony must be rooted in fact and reasonable inferences drawn therefrom; " 'purely conclusory and factually unsupported opinions' … [are] insufficient to support a gang enhancement." (*People v. Perez* (2017) 18 Cal.App.5th 598, 608, 610 (*Perez*); accord *People v. Gardeley* (1996) 14

11.

Cal.4th 605, 618, disapproved on other ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 683.)

Because "[n]ot every crime committed by gang members is related to a gang" (*Albillar*, *supra*, 51 Cal.4th at pp. 59–60), an expert's opinion that a crime was committed to benefit a gang must rest upon more than the assumed occurrence of the charged offense, evidence that a defendant is a gang member, and generalizations about gang culture or habits (*Perez*, *supra*, 18 Cal.App.5th at pp. 612–613; *People v. Rios* (2013) 222 Cal.App.4th 542, 573–574 (*Rios*); *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 (*Ochoa*)). The *specific circumstances of the offense* must support the expert's inferences that the conduct was committed to benefit the gang.[3] (See, e.g., *Perez*, at pp. 612–613 [gang expert testimony was insufficient to support a gang enhancement absent evidence that gang signs were used or gang affiliations declared, that the offense occurred in gang territory, or that the victims were rival gang members or saw gang tattoos or clothing]; *Rios*, at p. 574 [same]; *Ochoa*, at pp. 662–663 [same].) For instance, an expert opinion is sufficient to support a gang enhancement where there is evidence that the defendant committed a charged crime with known gang members while displaying gang paraphernalia and tattoos. (*Albillar*, at pp. 62, 68.) On the other hand, an expert opinion that a charged crime by a gang member acting alone was for the benefit of the gang because the defendant is a gang member and any violent crime enhances the gang's reputation is insufficient to support a gang enhancement. (*Perez*, at p. 610.)

---

**3** To be clear, a gang expert cannot opine directly on a particular defendant's intent or whether he committed a crime for a gang purpose. (*People v. Vang*, *supra*, 52 Cal.4th at p. 1049.) Rather, the expert is permitted only to give an opinion on a hypothetical subject's intent and whether a hypothetical crime was committed for a gang purpose. (*Ibid*.)

12.

## C.    Analysis

As a threshold matter, defendant contends that "in finding [defendant] not guilty of count 4, active participation in a criminal street gang, and making a not true finding on the gang enhancement appended to the false imprisonment charge in count 2, the jury rejected the sufficiency of the gang evidence presented."  Defendant continues, "count 3 could not have been committed with the intent required for the gang enhancement if count 2, which occurred at the same time, place, and under the same circumstances, with the same firearm, was not committed with the intent required for the gang enhancement, and active participation in a criminal street gang (count 4) did not exist."  Based on the jury's verdict on count 4 and finding on the gang allegation on count 2, defendant contends that the jury must have made factual findings that preclude a true finding on the gang allegation on count 3.

Even assuming defendant is correct that a not guilty verdict on count 4 and a not true finding on the gang allegation on count 2 are necessarily inconsistent with a true finding on the gang allegation on count 3, such inconsistency would not invalidate the verdict because "inherently inconsistent verdicts are allowed to stand."  (*People v. Avila* (2006) 38 Cal.4th 491, 600 (*Avila*); *People v. Lewis* (2001) 25 Cal.4th 610, 656.)  Whether the evidence is sufficient to support a specific count is evaluated "independent[ly] of the jury's determination that evidence on another count was insufficient."  (*United States v. Powell* (1984) 469 U.S. 57, 67 (*Powell*); see *People v. Covarrubias* (2016) 1 Cal.5th 838, 890–891.)  For that reason, we reject defendant's argument that the evidence was necessarily insufficient to support the gang enhancement on count 3 because the gang allegation on count 2 was found not true and he was found not guilty on count 4.

### 1.    Prong One:  Gang-Related Crime

Next, defendant contends that the evidence did not support a finding that he possessed the rifle for the benefit of or in association with a gang because Tinoco's

13.

opinion that the crime was committed for the benefit of the gang was based on unreasonable inferences and conjecture. We disagree.

Defendant argues that Tinoco unreasonably drew the inference that the phrase " 'drive off on East Side Bakers' " was "a gang proclamation for purposes of his 'for-the-benefit' analysis." Defendant suggests that Lopez did not know the meaning of the phase and it therefore could have been a reference to "a street[ ] or the name and/or location of the smoke shop."

To begin, although Lopez testified he did not know what " 'drive off on East Side Bakers' " meant, he also testified he thought East Side Bakers was a gang. Furthermore, defendant pointed a gun at his head, and he understood defendant to be commanding him to drive. However, what Lopez knew or understood was separate from Tinoco's opinion. Tinoco, who was an expert on gang culture, opined that the statement "promot[ed] the gang" and "help[ed] with [his] opinion … that [the underlying crime was committed for] the benefit of and in association with the gang." Tinoco's opinion that mentioning the gang's name while committing a crime suggested that the crime was to benefit a gang was not an unreasonable inference from the evidence because calling out a gang's name during an offense tends to suggest that the offense was gang-related. (*Perez*, *supra*, 18 Cal.App.5th at pp. 612–613 [considering whether the defendant " 'called out a gang name' " in determining whether substantial evidence supported the gang expert's opinion that a crime was committed to benefit a gang]; *Rios*, *supra*, 222 Cal.App.4th at p. 574 [same]; *Ochoa*, *supra*, 179 Cal.App.4th at p. 662 [same].)

Second, defendant relies on *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*) for the proposition that the evidence was sufficient only to show that he possessed the rifle for self-defense, not that he possessed the rifle for the benefit of the gang. (*Id*. at p. 1195.) Defendant's reliance on *Frank S.* is misplaced.

In *Frank S.*, the minor was arrested with a knife concealed on his person and told law enforcement that he had the weapon for self-defense from Southerners who had

14.

jumped him two days earlier. (*Frank S*., *supra*, 141 Cal.App.4th at pp. 1195, 1199.) The minor denied being a Norteño gang member but acknowledged he had Norteño friends. (*Id*. at p. 1195.) The gang expert opined that the minor possessed the knife to protect himself but also opined that his possession of the knife benefitted the Norteños because it provided them with protection should they be assaulted. (*Ibid*.) Based on that opinion, the trial court found the gang allegation true. (*Ibid*.) The court of appeal reversed for lack of substantial evidence supporting both the gang-related and specific intent prongs of the gang allegation. (*Id*. at pp. 1198–1199.) It explained, as to the first prong, "nothing besides weak inferences and hypotheticals show[ed] the minor had a gang-related purpose for the knife." (*Ibid*.) As to the second prong, the court continued, the "prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Id*. at p. 1199.) Evidence that the minor carried the knife to defend himself from Southerners did not prove that he had the specific intent to promote, further, or assist in criminal conduct by gang members. (*Ibid*.)

Here, in contrast, evidence was presented that defendant was an East Side Bakers gang member, in East Side Bakers gang territory, and with another East Side Baker gang member who knew that defendant possessed the rifle. Evidence was also presented that defendant drew the rifle, pointed it at Lopez, and mentioned the gang's name. In response to a hypothetical question mirroring the evidence,[4] Tinoco opined that

---

[4]    The prosecutor posed the following hypothetical question:

"You have an active member of the East Side Bakers who tells a female associate of the East Side Bakers that he wants to rob someone over social media. Later that same day or earlier the next morning of the next day that female associate invites over an acquaintance of hers who happens to be a young man from Wasco to a residential neighborhood in East Side Baker territory, not the traditional but in the current East Side Baker territory. When that young man from Wasco pulls up, the female associate opens the vehicle door and let[ ]s two active members of the East Side Bakers into the vehicle. One of them, a previously convicted felon, is armed with a firearm and pulls it out, puts it

15.

possession of a firearm by a person in defendant's position would be "for the benefit of and in association with the criminal street gang." Tinoco testified that the East Side Bakers gang would benefit if "two active gang members and an associate assist[ed] each other to lure a … young man from Wasco to a location where they then get into the vehicle and attempt to rob [him] and during the commission of the crime one of the gang members who is in possession of a firearm, which is one of the primary activities, also promotes the gang by saying East Side Bakers." In response to a more limited hypothetical, Tinoco testified that even if the East Side Bakers gang had not been mentioned, the fact that two gang members committed one or more of the primary activities of the gang together showed that the gang members acted in association.

The evidentiary gap present in *Frank S.* was simply not present in this case. Here, the opinion that defendant possessed the rifle to benefit the gang was supported by substantial evidence. (See *People v. Miranda* (2011) 192 Cal.App.4th 398, 412–413 [sufficient evidence supported the gang enhancement where the defendant was "accompanied by fellow gang members, the crime was committed in the gang's territory, and the gang's name was called out"].)

### 2.    Prong 2:  Specific Intent

Defendant also contends the evidence was insufficient to support the specific intent prong for two reasons. First, defendant acknowledges that the specific intent prong of a gang allegation may be satisfied with proof "that the defendant intended to and did

---

to the driver's head, and tells the driver to drive on East Side Bakers. The driver does as he is told and drives off against his will. During the drive there's a conversation about shoes where the female associate demands to know where her shoes are. The driver ultimately drives towards some law enforcement parked vehicles and ends the incident.

"Do you have an opinion as to whether—let's call it the crimes described in that hypothetical, an attempted robbery, kidnapping, felon in possession of a firearm, are for the benefit of or in association with the East Side Bakers, and, if you do have such an opinion, what do you base it on?"

16.

commit the charged felony with known members of a gang," because from such proof "the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) But he contends that this is not such a case because the jury's not true finding on the gang allegation for the false imprisonment conviction necessarily implies that defendant could not have possessed the firearm *with* gang-related intent at the same time that he falsely imprisoned Lopez *without* gang-related intent. We disagree.

As we have explained, our determination of whether the evidence was sufficient to support one enhancement is separate from the jury's determination of whether the evidence was sufficient to support another enhancement. (See *Powell*, *supra*, 469 U.S. at p. 67; *Avila*, *supra*, 38 Cal.4th at p. 600.) Even if those verdicts were inconsistent, the challenged verdict would stand if supported by substantial evidence. (See *Powell*, at p. 67; *Avila*, at p. 600.) Here, as discussed, evidence was presented that defendant possessed the rifle while he was in East Side Bakers territory with another East Side Bakers gang member who knew that he possessed the rifle, he pointed the rifle at Lopez's head, and he mentioned the East Side Bakers gang. Because defendant actually used the rifle in committing criminal activity—falsely imprisoning Lopez in an effort to force him to take defendant, Ortega, and Quiroz to the marijuana dispensary—to benefit known East Side Bakers gang members—defendant and Ortega—Tinoco's opinion that defendant possessed the rifle with the specific intent to benefit gang members was not based on unreasonable inference or conjecture. (*Albillar*, *supra*, 51 Cal.4th at p. 68 [the specific intent prong of a gang allegation may be satisfied with proof "that the defendant intended to and did commit the charged felony with known members of a gang," from which "the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"]; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 ["[c]ommission of a crime in concert with known gang members … supports the inference that the defendant acted with the specific intent to

promote, further or assist gang members in the commission of the crime"].) Substantial evidence supported a finding that defendant had the specific intent to benefit gang members by possessing the rifle.

Second, defendant argues the series of photographs depicting him displaying gang signs and firearms—including a firearm that looked similar to the rifle in this case—was insufficient to support a finding that he possessed the rifle with the requisite intent. Defendant characterizes the issue as the prosecutor having invited the jury to "engage in speculation, conjecture, or surmise, and then apply circular reasoning" when he directed the jury to photographs of defendant displaying gang signs and a firearm that looked similar to the rifle in this case. Specifically, he contends that the prosecutor was not permitted to invite the jury to conclude that defendant possessed the rifle for gang purposes on the date of the offenses merely because the photographs suggested defendant "want[ed] everyone to know that his possession of [the firearm in the photographs on a different date was] gang-related." Again, we disagree.

As an initial matter, the set of photographs depicting defendant holding a firearm and flashing gang signs was not the only evidence of defendant's specific intent to possess the rifle to promote, further, or assist in criminal activity by gang members. Even without those photographs, substantial evidence was presented that defendant committed a felony with another gang member in gang territory while mentioning the gang name and using the rifle.

Regardless, the jury could also have made multiple reasonable inferences regarding defendant's intent in possession of the rifle from the evidence that he had previously possessed firearms—and specifically a rifle that looked similar to the rifle in this case—with other gang members and while displaying gang signs. For instance, the jury could reasonably have concluded that defendant did not obtain the rifle for self-defense from a "homie [who] don't bang" (i.e., a friend who was not a gang member) as he had told officers. (See also *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052

18.

[evidence the defendant possessed a gun that "might have been" the weapon used in the crime but was not "necessarily" the weapon was relevant circumstantial evidence].) More generally, the jury could reasonably have inferred from defendant's posting of the photographs that defendant and Ortega were gang members and defendant wanted people to know that he possessed the rifle to benefit the gang. Those inferences could have supported the jury's conclusion that defendant possessed the rifle to promote or assist in the commission of crimes by gang members. (See *Albillar*, *supra*, 51 Cal.4th at pp. 62–63 [photographs depicting gang members wearing gang colors and flashing gang signs support the inference that a crime is gang-related]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [evidence of a defendant's gang affiliation, such as signs and symbols, can help prove intent in committing a crime]; *People v. Prunty* (2015) 62 Cal.4th 59, 83–84 (*Prunty*) [same].)

In short, viewed in the light most favorable to the judgment, sufficient evidence was presented to permit the jury to have found the gang allegation true beyond a reasonable doubt.

## II.    Ineffective Assistance of Counsel

In the alternative to his first claim of error, defendant contends that defense counsel was ineffective for conceding the truth of the gang allegation on count 3. The People argue that defense counsel's concession was (1) not deficient performance because it was a tactical decision to maintain credibility with the jury, and (2) not prejudicial because he was acquitted on other counts and found guilty of a lesser offense on count 2. We conclude defense counsel's performance was not deficient and therefore do not reach the question of whether prejudice resulted.

### A.    Additional Background

The prosecutor introduced two photographs depicting defendant displaying gang signs and holding a firearm that appeared similar to the rifle. One of those two photographs bore the caption "East Pride." The prosecutor asked the jury in his

19.

closing argument to "note that the gun used in this case … does appear to be the same weapon that is in a photograph that was taken from his Facebook profile where he is holding it, where he is throwing up an E, and the words East Pride are written below it. He apparently wants everyone to know that his possession of this weapon is gang-related."

Defense counsel then argued that defendant was not guilty on counts 1, 2, and 4, but counsel conceded defendant's guilt on count 3 and the truth of the gang allegation on count 3. Specifically, defense counsel argued:

> "So I am asking for a not guilty verdict on Count 1, on Count 2, guilty verdict on Count 3, and the enhancement is probably there. I mean, look at him. He's got the—he's holding the gun up [in the photographs]. So it's clearly for the benefit of a criminal street gang. And a not guilty verdict o[n] Count 4."

## B.    Relevant Law

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).) To establish ineffective assistance of counsel, defendant must show (1) counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *Ledesma*, at pp. 216–217.) If a defendant fails to show either deficient performance or prejudice, the ineffective assistance of counsel claim fails. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

"In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny." (*Ledesma*, *supra*, 43 Cal.3d at p. 216.) Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and

inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

"[A] defense attorney's concession of his client's guilt, lacking any reasonable tactical reason to do so, can constitute ineffectiveness of counsel." (*People v. Gurule* (2002) 28 Cal.4th 557, 612; accord *People v. Zimmerman* (1980) 102 Cal. App.3d 647, 657.) But, where evidence against a defendant is highly incriminating, defense counsel's concession of the truth of an allegation to preserve credibility with the jury on other issues is not deficient performance. (See *People v. Wade* (1998) 44 Cal.3d 975, 988; *People v. Mayfield* (1993) 5 Cal.4th 142, 177.) Indeed, " 'good trial tactics often demand complete candor with the jury, and … in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence.' " (*People v. Freeman* (1994) 8 Cal.4th 450, 498.)

## C. Analysis

Defendant argues that defense counsel did not make a reasonable tactical choice in conceding the truth of the gang allegation because he misunderstood its prongs and invited the jury to do "exactly what the case law forbids: [make the] inference that a gang member has a gun only for a gang purpose." In furtherance of his argument, defendant correctly notes that gang membership, criminal history, and commission of a primary offense of the gang are each independently insufficient to sustain a gang enhancement. (See *Prunty*, *supra*, 62 Cal.4th at p. 84; *Frank S.*, *supra*, 141 Cal.App.4th at p. 1199; *Albillar*, *supra*, 51 Cal.4th at p. 60.) However, in this case, evidence was presented of defendant's gang membership, criminal history, commission of a primary offense of the gang, *and* additional evidence in support of the gang allegation.

For defendant to prevail, we would have to conclude that defense counsel's concession that the gang allegation was proved on count 3 could not have been a reasonable tactical decision despite admission of (1) photographs of defendant holding a

firearm that looked similar to the rifle and flashing East Side gang signs with the caption "East Pride"; (2) Ortega's testimony that defendant was an East Side Bakers gang member; (3) evidence that defendant, while with another East Side Bakers gang member who knew he had a gun, in East Side Bakers territory, pointed a gun at Lopez's head and said "drive off on East Side Bakers"; (4) defendant's statement to law enforcement that Lopez "disrespect[ed]" him in combination with Tinoco's testimony regarding the importance of respect in gang culture; (5) Tinoco's testimony that possession of a firearm was a primary activity of the East Side Bakers gang; and (6) Tinoco's opinion that a hypothetical person in defendant's position would have benefitted the gang and its members through possession of a firearm and mentioning the gang's name while using the firearm. We cannot do so. As we described above, that evidence led to a reasonable inference that defendant possessed the rifle to benefit the East Side Bakers gang and with the specific intent to promote or assist in criminal conduct by East Side Bakers gang members. And, in fact, the evidence was very incriminating. (See *Prunty*, *supra*, 62 Cal.4th at p. 84 [evidence of a defendant's gang membership bears on a defendant's intent in committing a crime]; *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 413 [committing a crime with gang members, in gang territory, and while calling out the gang's name is evidence supporting a gang enhancement]; *Ochoa*, *supra*, 179 Cal.App.4th at pp. 662, 663, fn. 9 [calling out a gang's name suggests a gang member is acting for the benefit of a gang by attempting to intimidate on the gang's behalf].) In light of that evidence, we conclude concession of the truth of the gang allegation on count 3 fell within the wide range of professional competence and acceptable strategic decisions. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1211.)

## DISPOSITION

The judgment is affirmed.

22.